IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JACOB K. PANOWICZ, | ) | Case No. 8:23-cv-00483 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| CHARTER HEALTH HOLDINGS, INC. d/b/a | ) | |
| CHARTER HOME HEALTH OF OMAHA; | ) | |
| | ) | |
| CHARTER HEALTH CARE GROUP, LLC; | ) | |
| | ) | **AMENDED COMPLAINT** |
| PHAROS CAPITAL GROUP, LLC; | ) | **AND JURY DEMAND** |
| | ) | |
| PHAROS CAPITIAL PARTNERS III, LP; | ) | |
| | ) | |
| PHAROS CAPITAL PARTNERS III-A, LP; | ) | |
| | ) | |
| PHAROS CAPITAL PARTNERS GP III, LLC; | ) | |
| | ) | |
| PHAROS CAPITAL PARTNERS GP III-A, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

COMES NOW the Plaintiff, by and through his attorneys, and for his causes of action against the Defendants hereby states the following:

**PARTIES-VENUE-JURISDICTION**

1. Plaintiff JACOB K. PANOWICZ, is a resident of Omaha, Douglas County, Nebraska.

2. Defendant CHARTER HEALTH HOLDINGS, INC. d/b/a CHARTER HOME HEALTH OF OMAHA is a Delaware corporation conducting business in Nebraska providing home health services with its principal office located in Omaha, Douglas County, Nebraska.

3. Defendant CHARTER HEALTH CARE GROUP, LLC is a California corporation

1

conducting business in Nebraska with its principal office located in Covina, California. Herein, all above referenced Charter entities will be collectively referred to as "Defendant Charter."

4. Defendant PHAROS CAPITAL GROUP, LLC (hereinafter PCG) is a limited liability company organized under Delaware law, conducting business in Nebraska with is principal office located at 5511 Virgina Way, Suite 180, Brentwood, TN 37027.

5. Defendant PHAROS CAPITAL PARTNERS III, LP is a limited partnership organized under Delaware Law, conducting business in Nebraska with its principal office at 5511 Virgina Way, Suite 180, Brentwood, TN 37027.

6. Defendant PHAROS CAPITAL PARTNERS III-A, LP is a limited partnership organized under Delaware law, conducting business in Nebraska with its principal office 5511 Virgina Way, Suite 180, Brentwood, TN 37027.

7. Defendant PHAROS CAPITAL PARTNERS GP III, LLC is a limited liability company organized under Delaware law conducting business in Nebraska with its principal office 5511 Virgina Way, Suite 180, Brentwood, TN 37027.

8. Defendant PHAROS CAPITAL PARTNERS GP III-A, LLC is a limited liability company organized under Delaware law conducting business in Nebraska with its principal office 5511 Virgina Way, Suite 180, Brentwood, TN 37027.

9. PCG is a private equity firm and manager of private equity funds, Pharos Capital Partners III, LP and Pharos Capital Partners III-A, LP (collectively "Fund III"), which have owned a controlling stake in Defendant Charter as a portfolio company from on or about October 30, 2018 through the date of Plaintiff's termination on January 12, 2022. Defendants Pharos Capital Partners GP III, LLC and Pharos Capital Partners GP III-A, LLC are general partners and related entities to PCG and Fund III. Herein, all the above referenced Pharos entities will be collectively referred

to as "Defendant Pharos."

10.     This Court has subject matter jurisdiction over the claims arising under federal law pursuant to the provisions of 28 U.S.C. § 1331, and pendent supplemental jurisdiction of the state law claims pursuant to 28 U.S.C. §1367.

11.     Venue is appropriate in this District under 28 U.S.C. §§1391(b) and (c). Defendants either reside or do business in Douglas County and the acts about which Plaintiff complains occurred during the scope and course of his employment in Douglas County, Nebraska.

12.     On October 25, 2022, less than 300 days prior to the offending conduct outlined in Plaintiff's Complaint (Filing No. 1), Plaintiff filed a charge of discrimination with the Nebraska Equal Opportunity Commission, NEB 2-22/23-10-53040-S.

## FACTUAL BACKGROUND

13.     In 2018, Defendant Pharos became the majority stakeholder in home health-care provider Defendant Charter.

14.     At the time Defendant Pharos took controlling interest, Steve J. Larkin, an employee and member of Defendant Pharos' entrepreneur-in-resident program was installed as Chief Executive Officer of Defendant Charter.

15.     At all relevant times, Defendant Pharos managed and controlled Defendant Charter as a portfolio company through officer Larkin and at least three partners, Bob Crants, Anna Kovalokova and Ryan Shelton who served on the Board of Directors of Defendant Charter.

16.     At all relevant times, Defendant Pharos provided ongoing support and counsel to Defendant Charter through active board participation and working closely with management to formulate strategic plans and actively monitor performance through participation in the operational review process.

17. On or about February 2, 2021, Defendants Pharos and Charter acquired Physmed Home Health Care and Serene Care Hospice, sister companies in Omaha, Nebraska, owned by Domer Sodusta and managed by CEO, Plaintiff Panowicz.

18. Plaintiff Panowicz commenced employment with Defendants Charter and Pharos on or about February 2, 2021. Panowicz was hired by Defendants Charter and Pharos in the role of Vice President of Home Health.

19. Panowicz was promoted to VP of Operations by Larkin in or around July 2021.

20. Through his work with Larkin, Panowicz learned that all significant operational and financial decisions Larkin made were being directed and/or approved by Defendant Pharos. Specifically, in Panowicz's experience, operational decisions addressing compliance problems, including overpayments, potential acquisitions of other home health companies, and significant staffing or human resource decisions, including changes to Charter's leadership team, were all directed by and/or had to be approved by Defendant Pharos. In additional to telling Panowicz on several occasions that he would need to "run it by Pharos" or run it by "the Board," Larkin would routinely refer to Pharos's decisions and reasoning during his meetings with Defendant Charter's leadership team.

21. On or about December 21, 2021, Certified Oasis Trainer Angie Venditte brought some irregularities in Defendant's data that she found during an audit to Panowicz's attention.

22. Between December 21, 2021 and January 10, 2021, Panowicz had at least 10 documented meetings with Venditte, several other California team members, and Larkin wherein Panowicz investigated and voiced concerns that Defendants' data irregularities were indicative of billing fraud for their Medicare, Medicaid and managed care patients in California.

23. During the December and January investigation period, Panowicz initially

discovered that there were over 2,000 instances of fraud in which required paperwork was not completed and services were not provided in cases in which Medicaid, Medicare and other private insurance companies were billed.

24. On or about January 7, 2022, Panowicz was informed by Venditte and members of Defendants' leadership team that the number of fraudulent claims submitted without being properly documented, services completed or fully performed was estimated to be as high as 10,000.

25. On or about January 7, 2022, Panowicz emailed Larkin and reported the findings. Panowicz advised he would update Larkin further after a meeting which was scheduled to occur in Omaha, between Larkin and Panowicz face to face on January 10, 2022. Larkin was traveling to Iowa for personal reasons and was going to stop in Omaha to go over first quarter projections and plans, identify where Panowicz will invest his time and energy in 2022, and generally review Panowicz's work for the previous year.

26. Panowicz met with Larkin on or about January 12, 2022. Larkin began the meeting by expressing how well Panowicz was doing in his role as VP of Operations, he informed him that he would receive his 25% bonus for 2021, and they made travel plans for Panowicz in the upcoming quarters.

27. The January 12, 2022 meeting then transitioned to a discussion of the fraudulent billing issues previously raised by Panowicz after the audit. Larkin asked Panowicz during this meeting to estimate Defendants' exposure to Medicare for overbilled or improperly billed sums. Panowicz responded by saying our team has calculated that there are at least 10,000, or more, incomplete charts and that if the billing average is a modest $1,500 per episode the total would be $15,000,000 on the start of care and OASIS completion issues only, and that the term covered by this estimate would only go back to the end of 2018. Panowicz also noted that because Defendants'

biggest managed care contract is with Kaiser Permanente, it was reasonable to predict an external audit that would examine at least the years 2020 and 2021, and that Charter would be caught in its non-compliance status soon. Panowicz further recommended employment of a group of external auditors to determine how extensive the noncompliance was, complete a risk assessment, and then bring the matter to the attention of government personnel to arrange repayment of the fraudulently obtained sums.

28. After expressing his opinion on how to handle the fraudulent billing and payment issues, Larkin immediately terminated Panowicz, stating that "this was not going to work."

29. Panowicz asked Larkin why he was telling him this after just discussing the strategy for the year, and why he did not have the termination paperwork prepared and there was no human resources' involvement. Larkin said he was not prepared to terminate Panowicz that day, and that "we are done Jake." Larkin took Panowicz's company phone and computer and left the meeting.

30. Prior to termination, Plaintiff's job performance was above satisfactory.

31. At all relevant times, Defendant Pharos and Defendant Charter had sufficient common ownership, common management, centralized control of labor relations, and interrelation of operations between the entities to make them a single enterprise or employer with Defendant Charter.

32. At all relevant times, Defendant Pharos was a parent company that sufficiently dominated its subsidiaries' operations or controlled Plaintiff's employment to an extent that they are considered to be a joint employer with Defendant Charter.

33. On October 30, 2023, Plaintiff filed his Complaint against Defendants Charter in the United States District Court for the District of Nebraska alleging whistleblower retaliation and non-payment of wages under Nebraska state law, and retaliation under the False Claims Act.

34. On January 26, 2024, Defendant Charter filed a Petition in Bankruptcy in the United States Bankruptcy Court for the District of Delaware.

35. At all relevant times, Defendant Pharos exerted sufficient control of Defendant Charter's culture, policies, and decision-making, and/or undercapitalized Defendant Charter and/or siphoned funds from Defendant Charter to be held liable under a veil-piercing or alter-ego theory in accordance with federal common law.

36. At the time of his termination, Plaintiff was earning approximately $284,000 in salary annually working over 40 hours per week, plus bonuses and fringe benefits. As of the date of this filing, Plaintiff's lost wages resulting from Defendant's wrongful conduct are in excess of $704,926.91, and unpaid wages of $71,150.00 for an earned annual bonus.

37. As a result of Defendants' wrongful conduct, Plaintiff suffered lost wages, compensatory damages, including emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and has also incurred attorney's fees and other costs that are continuing.

## COUNT I

## WHISTLEBLOWER RETALIATION

## Neb. Rev. Stat. §48-1114(1)(c)

38. Plaintiff hereby incorporates paragraphs 1 through 37 as if fully set forth herein and states:

39. During his employment, Plaintiff engaged in protected activity, including but not limited to refusing to engage in and opposing billing fraud on Medicare, state Medicaid programs and private health insurers.

40. Defendants took adverse employment action against Plaintiff, including but not limited to terminating Plaintiff and other ways to be proven at trial.

7

41. There is a causal connection between Plaintiff's participation in protected whistleblower activity and Defendants' adverse action against him.

42. As a result of Defendant's retaliation, Plaintiff has in the past and will in the future suffer injuries and damages, including, but not limited to mental and emotional distress; humiliation; fear, embarrassment; lost enjoyment of life; lost wages and benefits; front pay, other emoluments of employment and attorney's fees.

## COUNT II

## NEBRASKA WAGE PAYMENT AND COLLECTION ACT

### Neb. Rev. Stat. § 48-1229 et seq.

43. Plaintiff hereby incorporates paragraphs 1 through 42 as if fully set forth herein and states:

44. Defendants meet the definition of employer set forth in Neb. Rev. Stat. § 48-1229(1), and as an employer, Defendant is subject to, and is required to abide by, the provisions of the Nebraska Wage Payment and Collection Act, Neb. Rev. Stat. § 48-1228, et seq. (hereafter "NWPCA").

45. Plaintiff meets the definition of employee set forth in Neb. Rev. Stat. § 48-1229(2), and as an employee, Plaintiff is entitled to the benefits and protection of the NWPCA.

46. Plaintiff performed labor and services for Defendants for which he was not compensated for including his annual bonus for 2021.

47. Defendants willfully failed to pay Plaintiff his wages in violation of the NWPCA and it has been more than thirty (30) days since the regular payday designated by Defendant.

# COUNT III

## FALSE CLAIMS ACT ("FCA") WHISTLEBLOWER RETALIATION

## 31 U.S.C. § 3730(h)

48. Plaintiff hereby incorporates by reference paragraphs 1 through 47 and states:

49. Defendants Charter and Pharos

50. During his employment, Plaintiff engaged in conduct protected by the FCA;

51. Defendants knew that Plaintiff engaged in the protected activity;

52. Defendants retaliated against Plaintiff, including but not limited to, subjecting him to termination;

53. Defendants' retaliation was motivated solely by Plaintiff's protected activity; and,

54. Plaintiff suffered damages resulting from Defendants' retaliation.

## DAMAGES

55. Plaintiff hereby incorporates by reference paragraphs 1 through 54 and states:

56. As a result of Defendants' illegal conduct, Plaintiff has suffered damages and seeks the following relief:

   a. Unpaid wages, including Plaintiff's earned bonus, under the NWPCA;

   b. Back pay and lost benefits from termination to the time of trial on Plaintiff's state law whistleblower retaliation claim;

   c. Double back pay and lost benefits from termination to the time of trial on Plaintiff's FCA whistleblower retaliation claim;

   d. Front pay including wages and other benefits;

   e. Tax gross up on economic damages to offset the increased tax on any economic damages award;

f. Compensatory damages for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses;

g. Attorney's fees, expert witness fees and other reasonable costs; and,

h. Pre-judgment and post judgment interest.

WHEREFORE, Plaintiff demands judgment against Defendants in an amount which will fully and fairly compensate him for his injuries and damages, for all his general and special for costs, attorney's fees, interest and for such other relief as just and equitable.

Plaintiff demands a trial by jury.

Dated: January 10, 2025.

JACOB K. PANOWICZ, Plaintiff

BY: s/ Jennifer Turco Meyer
Jennifer Turco Meyer, #23760
Turco Meyer Law, LLC
4309 South 174th Avenue
Omaha, Nebraska 68135
(402) 577-0252 phone
jennifer@turcomeyer.law
Attorney for Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that on January 10, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

| | |
|---|---|
| Katie S. Wayne | kwayne@grsm.com |
| Earl G. Greene , III | eggreene@grsm.com |

s/ Jennifer Turco Meyer